2025 IL App (1st) 232386-U
No. 1-23-2386
Order filed September 30, 2025

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 07 CR 15511 01 |
| | ) | |
| LAMAR STEPHENS, | ) | The Honorable |
| | ) | Geraldine D'Souza, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court.
Justices Pucinski and Gamrath concurred in the judgment.

**ORDER**

¶ 1    *Held*: Affirmed. The circuit court properly dismissed the postconviction petition at the second stage. The record shows any error at the *Krankel* inquiry was harmless, and thus, appellate counsel provided effective assistance by winnowing a meritless challenge.

¶ 2    Lamar Stephens seeks further proceedings to develop his claim that trial counsel provided ineffective assistance during his trial for first-degree murder. He initially raised the claim after the trial, triggering a *Krankel* inquiry. Appellate counsel did not bring up the *Krankel* inquiry on the direct appeal. Stephens later again raised the claim against trial and direct appeal counsel. That petition was dismissed at the second stage of postconviction proceedings. On appeal from the

dismissal, Stephens focuses his claim not at his trial counsel, but rather at his direct appeal counsel for not having challenged the *Krankel* inquiry itself.

¶ 3    We review the claim against the trial record, and conclude that direct appeal counsel rendered competent representation, and that the circuit court appropriately dismissed the postconviction petition. Accordingly, we affirm.

¶ 4                                    Background

¶ 5    Lamar Stephens admitted multiple times that he went into a jealous rage, strangled his ex-wife to death, and then fled from their hotel room. We affirmed his conviction and sentence for first-degree murder. *People v. Stephens*, 2015 IL App (1st) 131084-U, ¶ 32. He later petitioned for postconviction relief, raising several claims that challenged the charging instrument, trial court rulings, and the performance of his trial counsel and direct appeal counsel. At the second stage of proceedings, the circuit court granted the State's motion to dismiss, finding all claims lacked merit.

¶ 6    On appeal from the dismissal, Stephens pursues a single claim: that counsel in the direct appeal provided ineffective assistance by failing to argue the trial court erred in conducting the *Krankel* inquiry. *People v. Krankel*, 102 Ill. 2d 181 (1984). Stephens had triggered this inquiry by faulting trial counsel for failing to present and argue "a mountain of evidence" that, in his view, would demonstrate he committed a lesser offense either due to acting recklessly or under provocation.

¶ 7    We first focus on how trial counsel handled Stephens's mental state before, during, and after trial. Next, we examine Stephens's assertions during the *Krankel* inquiry and in the postconviction proceedings.

¶ 8                                    *Trial Counsel*

¶ 9     Trial counsel subpoenaed Stephens's medical records to explore his "mental capacity." After leaving his ex-wife dead at the hotel, Stephens drove to a police station where he reported having suicidal thoughts. An ambulance took him to a hospital. After transfer to a psychiatric ward in another hospital, Stephens confessed to hospital staff and police what he had done.

¶ 10    Trial counsel retained a clinical psychologist to evaluate Stephens's "mental status at the time of the offense." The psychologist met with Stephens six times for a total of 17 hours, during which she administered psychological tests. While discussing the events "before, during, and after" the offense, Stephens admitted being "[j]ust angry" and that he "[d]idn't think." She interviewed Stephens's mother and roommate, reviewed hospital records, and examined police reports.

¶ 11    The psychologist concluded that Stephens was not insane when he strangled his ex-wife, and that he understood the criminality of his actions. His behavior stemmed from a "long-standing internalized anger that erupted into impulsive rage[.]" His feelings of "humiliation and rage [were] likely due to personality issues and not [] depression per se." The psychologist described Stephens as emotionally immature with a tendency "to express his feelings in dramatic and intense ways." The combination of stress, depression, and intoxicating substances "coalesced" into a "powder keg of emotions" that "loosened his defenses and disinhibited his controls, allowing his rage to erupt and drive his actions."

¶ 12    Trial counsel told the court that the defense would not rely on the psychologist's testimony at trial. Counsel also litigated an unsuccessful motion to suppress Stephens's statements.

¶ 13    Trial counsel opened the jury trial by describing how Stephens intended to reconcile with his ex-wife because he loved her. When she insulted him, his actions came from a place of "pain,

embarrassment, and anguish." Afterward, he felt overwhelmed by "depression" and feelings of "regret and suicide." Although Stephens's actions led to her death, counsel asserted that Stephens never intended to kill her.

¶ 14    Trial counsel elicited testimony from hotel staff and law enforcement that Stephens and his ex-wife were calm and pleasant when they checked into the hotel. No sounds of distress were heard from their room, and after the discovery of her body, nothing in the room appeared out of place, as if a struggle had occurred.

¶ 15    The medical examiner ruled the cause of death as manual strangulation. The examiner also testified that a person typically loses consciousness after 30 seconds of choking and will die after four to six minutes of continuous pressure.

¶ 16    Stephens testified that, on the day he killed his ex-wife, they discussed their relationship and had sex twice. He hoped they would "get back together." But she compared him to a man she had been seeing named Tony, which hurt him. When her phone beeped and he saw Tony's name, Stephens broke her phone. They stood face-to-face, and she pushed him.

¶ 17    When trial counsel asked what she specifically said, the State objected. At a sidebar, trial counsel argued that the ex-wife's statements were admissible to show Stephens's "state of mind," which was relevant to the "basis of the charge": whether Stephens intentionally or knowingly took her life. The trial court ruled that counsel could elicit testimony about what Stephens's ex-wife said before the strangulation. Stephens testified, "She said I wished you would have died ***[.] She kept telling me that I needed to get my stuff together, needed to get my own place. Tony got his own place. Sex was better than you, and I just snapped."

¶ 18    Stephens placed his hands around her neck as she tried to stop him. He "was so upset" that he could not remember how much time passed, whether his eyes were open or closed, or whether he heard or felt anything. When he released his hands, he saw her tongue protruding from her mouth. He did not think she was breathing, but could not be sure. He "panicked" and left, taking her keys and car. He insisted that he "didn't intend to take her life."

¶ 19    In rebuttal, the State called an employee at the hospital where Stephens went after reporting to the police his suicidal thoughts. She testified that Stephens told her he "choked his ex-wife" because "[she] had humiliated him and took everything he worked for."

¶ 20    During the jury-instruction conference, the court denied trial counsel's request for an instruction on second-degree murder. The State moved to bar trial counsel from arguing that Stephens's suicidal thoughts and depression negated the intent required for first-degree murder. Counsel did not object.

¶ 21    Trial counsel began closing arguments by questioning what it meant to be in one's "right mind," "to be able to perceive what's going on," and to "get through the day." Counsel described Stephens's intentions as full of "love in his heart" until the conversation with the victim about Tony "erupted" into a disagreement. Counsel described the effect the victim's words had on his state of mind, and that he "snapped," because "Tony was [his] breaking point."

¶ 22    When counsel began to argue about statements made by Stephens's ex-wife, the State objected. At a sidebar, trial counsel explained that her statements related to Stephens's "state of mind" because "his state of mind at the time of the murder is the complete crux of the case." The State countered that counsel should not argue state of mind because the defense of insanity was not an issue. The court sustained the objection, instructing counsel to "move on."

¶ 23    Trial counsel returned to the argument, stating "something in [Stephens's] mind snapped." Counsel then reviewed the physical evidence and the testimony to argue that Stephens "lost it" but never intended to kill the victim. Counsel concluded by urging the jury to consider the mental states of knowledge and intent, asserting that Stephens's "actions were not intentional."

¶ 24    The jury returned verdicts of guilty on both knowing and intentional first-degree murder. At sentencing, trial counsel called the psychologist to testify in mitigation, and her reports were admitted into evidence. The court referenced that evidence during mitigation before sentencing Stephens to 40 years in prison.

¶ 25                                    *Krankel*

¶ 26    After denying a post-sentencing motion, the trial court considered Stephens's *Krankel* motion. Stephens alleged that trial counsel had evidence of his mental impairment, including hospitalizations, which should have been presented to the jury to support an involuntary manslaughter instruction. In court, Stephens confirmed his entire claim as:

> "Counsel had evidence that – of my mental disability. And he had information that I was in 12 different mental hospitals and that I was on Social Security based on my – for my mental disability. None of this was brought up in trial. And *People v. Tanner* states that the basic difference between involuntary manslaughter and first-degree murder is the mental state that accompanies the conduct resulting in the victim's death. So with that, I feel I didn't get a fair trial and that he was ineffective in my case."

¶ 27    The State asserted: (i) the jury heard no evidence of insanity, recklessness, or involuntary manslaughter, (ii) Stephens's testimony described an intentional killing, and (iii) the evidence emphasized by Stephens related to an irrelevant theory of diminished capacity.

¶ 28    The trial court denied Stephens's motion:

"I believe that \*\*\* the attorneys that you are claiming ineffective assistance, are two of the best defense lawyers that the system can offer you. It's really a misstatement. [Trial counsel] is an excellent attorney. He used every possible means of defense to help you in your case. Obviously, the facts of the case are the facts of the case. Based on your own testimony, you convicted yourself in this case. So there was no ineffective assistance of counsel."

¶ 29    His direct appeal counsel did not attack the validity of the *Krankel* inquiry. *Stephens*, 2015 IL (1st) 131084-U, ¶¶ 26-28, 29.

¶ 30                    *Postconviction Proceedings*

¶ 31    Stephens petitioned for postconviction relief, raising several claims. Pertinent here, he alleged counsel on direct appeal provided ineffective assistance by failing to challenge the *Krankel* inquiry as inadequate. He attached his affidavit and medical records.

¶ 32    Stephens stated that he gave trial counsel information to support an insanity defense, specifically, his suicidal hospitalizations from 2002 to 2007, and that his sisters could attest how his relationship with his ex-wife made him depressed, suicidal, and emotionally unstable. He asserted that after informing his trial counsel of this information, they refused to raise his mental health or insanity as a defense.

¶ 33    The court advanced the petition to the second stage and appointed counsel, who filed a 651(c) certificate and declined to amend the original petition. The State moved to dismiss. In granting the State's motion, the court found Stephens's claims to be meritless.

¶ 34                                    Analysis

¶ 35     Stephens contends his postconviction petition made a substantial showing of ineffective assistance due to direct appeal counsel's failure to challenge the adequacy of the *Krankel* inquiry. The parties agree that the State should not have participated in that inquiry. So, this dispute ultimately hinges on whether the record was sufficient for the trial court and appellate counsel to evaluate Stephens's claim that he did not receive effective assistance from his trial counsel.

¶ 36     Postconviction proceedings have three distinct stages. 725 ILCS 5/122-1 *et seq.* (West 2016). At each stage, the petitioner bears the burden of showing they qualify for relief. *People v. Allen*, 2015 IL 113135, ¶¶ 21-22. We review the dismissal of a petition without an evidentiary hearing *de novo*. *People v. Coleman*, 183 Ill. 2d 366, 388 (1998).

¶ 37     Stephens's postconviction petition advanced to the second stage. "At the second stage, the circuit court must determine whether the petition and any accompanying documentation make a substantial showing of a constitutional violation." *People v. Hodges*, 234 Ill. 2d 1, 11 n. 3 (2009). Stephens argued that his direct appeal counsel provided ineffective assistance under *Strickland v. Washington*, 466 U.S. 668, 685-87 (1984) (defining ineffective assistance of trial counsel). When assessing Stephens's claim at the second stage, all factual allegations are assumed true unless the trial record positively refutes them. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006).

¶ 38     In light of this, we accept Stephens's factual allegations as true and determine: (i) whether direct appeal counsel was objectively unreasonable for not challenging the *Krankel* inquiry, and (ii) whether, absent direct appeal counsel's error, a reasonable probability exists that we would have remanded the case for a new inquiry. See *People v. Caballero*, 126 Ill. 2d 248, 269-70 (1989) (defining ineffective assistance of direct appeal counsel).

¶ 39                                                    *No Error*

¶ 40    Stephens contends the insufficiency of the *Krankel* inquiry was evident from the record, and thus, direct appeal counsel erred by not raising it on appeal. We disagree.

¶ 41    Direct appeal counsel need not raise " 'every conceivable issue.' " *People v. English*, 2013 IL 112890, ¶ 35 (quoting *People v. Williams*, 209 Ill. 2d 227, 243 (2004)). Counsel acts reasonably by disregarding meritless issues. *E.g.*, *Williams* at 244 ("[I]f the [] claim is completely without merit, appellate counsel's refusal to raise the issue, despite petitioner's instructions to the contrary, was reasonable."). And counsel best serves their client by exercising " 'professional judgment to select from the many potential claims of error that might be asserted[.] '" *English*, 2013 IL 112890, ¶ 35 (quoting *Williams* at 243).

¶ 42    Our question becomes: Did direct appeal counsel act reasonably by declining to raise an issue about the *Krankel* inquiry? After all, the parties agree that the trial court erred by permitting the State to participate at the *Krankel* inquiry. See *People v. Jackson*, 2020 IL 124112, ¶ 114 (finding error where State participated in inquiry by responding to defendant's claims).

¶ 43    Generally, *Krankel* inquiries serve the narrow purpose of "allowing the trial court to decide whether to appoint independent counsel to argue a defendant's *pro se* posttrial ineffective assistance claims." *Jackson,* 2020 IL 124112, at ¶ 95. A brief discussion with the defendant and counsel may suffice to determine possible neglect. See *People v. Moore*, 207 Ill. 2d 68, 78 (2003). This is not always required. The trial court can " 'base its evaluation on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face.' " *People v. Roddis*, 2020 IL 124352, ¶ 53 (quoting *Moore*, 207 Ill. 2d at 79).

¶ 44    The trial court need not appoint counsel to investigate possible neglect when the record refutes the defendant's claims. *People v. Jolly*, 2014 IL 117142, ¶¶ 29-30. Likewise, on appeal, errors during a *Krankel* inquiry do not automatically lead to reversal. *Jackson*, 2020 IL 124112, ¶ 120 (re-affirming State participation during *Krankel* inquiry subjected to harmless error review). Whether at the trial level or on appeal, courts evaluate a defendant's claim against the record of the proceedings. *Jolly*, 2014 IL 117142, ¶¶ 29-30; *Jackson*, 2020 IL 124112, ¶ 120.

¶ 45    Stephens disputes whether the record leading to his conviction and sentence suffices to reach the merits of his claim. He argues that the trial court: (i) "failed to examine the factual bases for [his] claim," (ii) "relied on its knowledge of [trial] counsel's performance in other cases," and, as a result, (iii) created a "record that was not sufficiently developed" to assess his claim's merits. He does not argue that his specific claim against counsel had merit or identify which factual issues remain undeveloped. Indeed, he focuses on the adequacy of the *Krankel* inquiry.

¶ 46    We reject the premise of Stephens's argument, namely, that "where the [trial] court fails to conduct an adequate inquiry, it cannot be determined whether the defendant's claims have merit[.]" This is a misstatement of the law. Our supreme court rejected the idea that State participation at a *Krankel* inquiry necessarily "results in 'an unreliable record which cannot be examined to determine if it is harmless' and 'will never produce the type of neutral record required for harmless error review.' " *Jackson*, 2020 IL 124112, ¶ 119 (quoting defendant's argument on appeal).

¶ 47    We also reject Stephens's assertion that the trial court failed to examine the factual bases of his claim. When rejecting Stephens's posttrial claim, the court stated, "[Trial counsel] used every possible means of defense to help you in your case. Obviously, the facts of the case are the facts of the case. Based on your own testimony, you convicted yourself in this case." In context,

this refers to counsel hiring a psychologist, litigating a motion to suppress statements, and arguing the insufficiency of the State's proof of intent—all in defense of Stephens against overwhelming evidence of guilt.

¶ 48     Again, Stephens triggered the *Krankel* inquiry by faulting trial counsel for failing to present and argue "a mountain of evidence" that, in his view, would prove he committed a lesser offense either because he acted recklessly or under provocation. But the record shows that "mountain of evidence" was not mitigating.

¶ 49     As the trial court was well aware, the psychologist described at sentencing how she had concluded before trial that Stephens was not insane when he strangled his ex-wife. See generally *People v. Chevalier*, 131 Ill. 2d 66, 72 (1989) (adultery with spouse as provocation generally limited to where parties are discovered in act of adultery or immediately before or after act, and killing immediately follows discovery). In her professional opinion, Stephens understood the criminality of his conduct.

¶ 50     The trial court found at the *Krankel* inquiry that Stephens's testimony convicted him by underscoring the psychologist's findings. Stephens had described strangling his ex-wife in a jealous rage and abandoning her body while absconding with her keys and car. The medical examiner noted that her death happened not in the 30 seconds before she passed out, but upward of five and a half minutes later, as Stephens continued pressing her neck, causing her tongue to protrude. *Cf. People v. Mitchell*, 105 Ill. 2d 1, 9-10 (1984) (conduct evinced recklessness, not intent to kill, where defendant tried to get help for victim after incident).

¶ 51     Contrary to Stephens's claim at the *Krankel* inquiry, not even minimal evidence existed for a conviction of a lesser offense. Even if the trial court had erred in mentioning trial counsel's

reputation, it would not warrant a reversal, as Stephens's claim against trial counsel lacked merit. *Jackson*, 2020 IL 124112, ¶ 120 (error is harmless where result of inquiry would have been same absent error). The court properly dismissed Stephens's claim because the record refuted the allegation that trial counsel had neglected the case. *People v. Chapman*, 194 Ill. 2d 186, 230-31 (2000) (proper to dismiss conclusory claim at *Krankel* inquiry).

¶ 52 Accordingly, direct appeal counsel acted reasonably by not challenging the adequacy of the *Krankel* inquiry. See *Williams*, 209 Ill. 2d at 248 (holding counsel acted reasonably by not raising *Batson* claim on direct appeal). Stephens has not established that the direct appeal counsel made any errors.

¶ 53 *No Prejudice*

¶ 54 Nor has Stephens demonstrated that, absent error by direct appeal counsel, a reasonable probability exists that the outcome of the proceedings on direct appeal would have been different. See *Caballero*, 126 Ill. 2d at 269-70 (defining ineffective assistance of direct appeal counsel). For the reasons we gave, any challenge to the *Krankel* process lacked merit, meaning we would not have had grounds in the earlier appeal to remand for a new *Krankel* inquiry. See, *e.g.*, *Jackson*, 2020 IL 124112, ¶ 120 (re-affirming State participation during *Krankel* inquiry subjected to harmless error review).

¶ 55 Affirmed.